JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II.  BASIS OF JURISDICTION    (Place an "X" in One Box Only)

☐ 1   U.S. Government
       Plaintiff

☐ 3   Federal Question
       (U.S. Government Not a Party)

☐ 2   U.S. Government
       Defendant

☐ 4   Diversity
       (Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>  Student Loans<br>  (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>  Liability<br>☐ 320 Assault, Libel &<br>  Slander<br>☐ 330 Federal Employers'<br>  Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>  Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>  Product Liability<br>☐ 360 Other Personal<br>  Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury -<br>  Med. Malpractice<br>☐ 365 Personal Injury -<br>  Product Liability<br>☐ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>  Property Damage<br>☐ 385 Property Damage<br>  Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br>  of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br>  Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>  28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>  Exchange<br>☐ 875 Customer Challenge<br>  12 USC 3410 |
| | | | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 710 Fair Labor Standards<br>  Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting<br>  & Disclosure Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act<br>☐ 893  Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information<br>  Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>  Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities -<br>  Employment<br>☐ 446 Amer. w/Disabilities -<br>  Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate<br>  Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc.<br>  Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus -<br>  Alien Detainee<br>☐ 465 Other Immigration<br>  Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>☐ 871 IRS—Third Party<br>  26 USC 7609 | ☐ 900Appeal of Fee Determination<br>  Under Equal Access<br>  to Justice<br>☐ 950 Constitutionality of<br>  State Statutes |

## V.  ORIGIN    (Place an "X" in One Box Only)

☐ 1   Original
       Proceeding

☐ 2   Removed from
       State Court

☐ 3   Remanded from
       Appellate Court

☐ 4   Reinstated or
       Reopened

☐ 5   Transferred from
       another district
       (specify)

☐ 6   Multidistrict
       Litigation

☐ 7   Appeal to District
       Judge from
       Magistrate
       Judgment

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing  (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:

## VII.  REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
  UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☐ Yes   ☐ No

## VIII.  RELATED CASE(S)
IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**Edward E. Kopko, Esq.**
Edward E. Kopko, Lawyer, P.C.
Attorney for Plaintiff, A.G.
308 N Tioga St., Second Floor
Ithaca, New York 14850
(607) 269-1300; (607) 269-1301 fax
ekopko@kopko.law

| | |
|---|---|
| A.G.,<br><br>                                    Plaintiff,<br><br>v.<br><br>MATTHEW GREEN; Corrections Officer in his official and individual capacities; ANTHONY J. ANNUCCI, Acting Commissioner of the New York Department of Corrections and Community Supervision; and ALBION CORRECTIONAL FACILITY.<br><br>                                    Defendants. | Index No. _____<br><br><br>**Jury Trial Demanded** |

| |
|---|
| **COMPLAINT** |

Plaintiff, A.G. by and through her attorney, Edward E. Kopko, Lawyer, P.C., asserts a claim against the Defendants, upon causes of action stated as follows:

## PRELIMINARY STATEMENT

1. Eight months after a putative class-action lawsuit was filed seeking to curb the sexual abuse of female prisoners in New York State prisons including Albion Correctional Facility, Defendant Correction Officer MATTHEW Green ("Green") followed a female inmate at ALBION CORRECTIONAL FACILITY ("Albion") into a linen closet and sexually assaulted her. Green's victim, A.G., brings suit under 42 U.S.C. § 1983 against Green, and against those who enabled his assault against

A.G. "Got to pay for perks," Green told A.G. as he pulled her by the shoulders and pushed her head down towards his exposed penis.

2. Green's acts were the direct result of the pervasive culture of impunity for corrections officers and retaliation against victims that exist in women's prisons in New York, and across the country. This effect is set forth more specifically in the aforementioned class action against Defendant ANTHONY J. ANNUCI ("Commissioner Annucci"), two other former corrections officers at Albion, and seventeen other Defendants, *Stone v. Annucci et al.* 20-cv-1326. Furthermore, Green's acts are the result of the fact that in 2021, all-female prisons are predominately staffed with male corrections officers. Unlike in the vast majority of cases, A.G. is able to corroborate her allegations with DNA evidence, which led to Green's arrest and prosecution and conviction.

3. Plaintiff A.G. brings suit against her assailant, former Albion Corrections Officer Matthew Green for the torture, humiliation, trauma, physical and emotional pain and suffering that he caused her. She also brings suit against those with policy-making authority and responsibility for the safety and well-being of A.G., who were on notice of the substantial risk of sexual abuse faced by A.G., through various complaints against Defendant Green and prior arrests of and lawsuits against Albion Correctional Officers for similar sexual conduct.

4. Commissioner Annucci, Acting Commissioner of New York Department of Corrections and Community Supervision ("DOCCS") failed to implement policies

protecting A.G. from sexual abuse by corrections officers, such as Green. Albion negligently supervised Green enabling him to engage in his sexual assault of A.G..

5. Accordingly, A.G. brings this civil rights action under 42 U.S.C. § 1983 to vindicate rights of the Plaintiff under the United States Constitution, the New York State Constitution, and the statutory and common laws of the United States and the State of New York.

## JURISDICTION

6. Subject matter jurisdiction over federal constitutional issues is proper in this Court pursuant to 28 U.S.C. § 1331. A.G. also invokes the Court's supplemental jurisdiction under 28 U.S.C. § 1367 over any and all state law claims and causes of action, which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federal claims and causes of action. This Court has jurisdiction to order damages, attorneys' fees, injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because the events giving rise to the claim occurred inside Albion Correctional Facility, located within the Western District of New York.

## IDENTITY OF THE PARTIES

8. During the events that gave rise to this action, Plaintiff A.G. ("A.G.") was a female inmate at Albion Correctional Facility, located in the County of Orleans, State of New York.

9. Defendant Anthony J. Annucci ("Commissioner Annucci") is and was the Acting commissioner of the New York Department of Corrections and Community Supervision ("DOCCS").

10. Commissioner Annucci is sued herein solely in his official capacity.

11. Albion Correctional Facility ("Albion") is medium level security women's prison in Albion, County of Orleans, State of New York, existing under the operation and control of DOCCS.

12. Albion is located at 3592 State School Road, Albion, New York 14411.

13. Defendant Matthew Green ("Green"), at all times pertinent herein, was a corrections officer at Albion. On or around May 25, 2021, Green was arrested for and charged with felony third-degree criminal sexual act and official misconduct for the allegations set forth in this Complaint.

14. Green is sued in both his individual and official capacity.

## FACTS COMMON TO ALL CLAIMS

15. In 2018, A.G. was charged with and plead guilty to criminal sale of a controlled substance in the third degree. She was then sentenced to a thirty-six-month prison sentence in April of 2019 and commenced her sentence in Albion Correctional Facility.

16. On October 4, 2020, A.G. was intentionally and violently attacked, sexually assaulted, and battered by a male corrections officer, Defendant Green, at Albion Correctional Facility.

**Green followed A.G. into a linen closet and raped her.**

17. On October 4, 2020, A.G. reported to work at Albion's infirmary on or around 7:10 am.

18. During the morning hours, A.G. and an inmate work partner served breakfast and trays to the patients in the Infirmary and to the patients in the Mental Health area.

19. At Albion's designated lunch time, A.G. and her work partner served lunch trays to the patients in the infirmary and in the Mental Health area.

20. At approximately 1:15 pm, Defendant Green shared food, including some Italian bread, with the A.G., her work partner, and other porters who were then in that area of the Infirmary.

21. The porters left at approximately 1:30 pm, and A.G. began doing laundry.

22. During this time, Defendant Green was patrolling around the laundry area.

23. A.G. folded laundry and placed it in the linen closet.

24. On or around 1:45 pm, Green followed A.G. into the linen closet.

25. Upon entering the linen closet behind A.G., Green pulled A.G. by her shoulders and pushed her head down towards his exposed penis.

26. Green told A.G. that she has "got to pay for perks."

27. Green forcibly grabbed A.G..

28. Green forced A.G. to perform oral sex on his exposed penis.

29. A.G. was sexually assaulted.

30. Green ejaculated in A.G.'s mouth and told her that it was "good."

31. As he pulled his penis from her mouth, Green dragged his penis along A.G.'s uniform jumper and T-shirt.

32. A.G., shell shocked, disgusted and terrified, left the linen closet and quietly returned to the kitchen area of the Infirmary.

33. At approximately 3:00 pm, A.G.'s shift ended.

34. A.G. and her work partner returned to their respective prison tiers.

35. At approximately 7:30 pm, A.G. called friends to tell them about the sexual assault.

36. Upon information and belief, one of A.G.'s friends contacted the New York State Police ("NYSP") directly.

**A.G. sought medical attention and DNA evidence is collected.**

37. At approximately 9:30 pm, three correctional officers and one sergeant brought A.G. to the medical area of Albion.

38. At some point during that evening, members of the NYSP and members of the Office of the State Inspector General interviewed A.G..

39. A.G. gave a statement to the NYSP and/or members of the State Inspector General's office.

40. At approximately 4:00 am on or about October 5, 2020, A.G. was transported to the Erie County Medical Center ("ECMC").

41. At ECMC an oral rape kit was performed on A.G..

42. At approximately 10:30 am, A.G. was returned to Albion and was placed in an isolation room.

43. Sometime thereafter, A.G. was transferred from Albion to Taconic Correctional Facility, in Westchester County.

44. DNA evidence has since been detected on A.G.'s DOCCS issued uniform that she was wearing at the time of the attack, and which was recovered by the NYSP.

45. After an investigation by the NYSP, or around May 25, 2021, Green was arrested and charged with felony third-degree criminal sexual act and official misconduct. The case was prosecuted by the Orleans County District Attorney and Defendant Green pled guilty to forcible compulsion and official misconduct and was sentenced to 6 years' probation and an order of protection was issued to A.G..

46. A.G., upon good behavior, served only half her time in prison before being released on November 1, 2020. Yet, the trauma A.G. faces causes her to relive her sexual assault every single day of her life. As a result of Green's sexual assault upon A.G., A.G. suffered serious injuries—both physical and psychological—including, but not limited to, the ingestion of Green's bodily fluids; depression; fear; anxiety; extreme emotional distress; humiliation; stress; the inability to sleep; that some of her injuries may be permanent; that she required medical attention and medicines; will be required to seek further medical attention in the future; and was prevented from attending her daily activities.

47. Defendants are aware of systematic failures to protect female inmates from sexual abuse by correctional staff.

48. The Defendants are aware that inmates are at risk of sexual abuse from prison staff.

49. The Defendants are aware of the substantial risk to women prisoners of sexual conduct by male staff in within Albion's own walls.

   a. In October 2016, Christopher Claud, a former corrections officer at Albion, was arrested and charged with forcible touching and official misconduct in connection with "inappropriate relations" that he had with a female inmate at Albion while operating in his former capacity as a corrections officer thereat.

   b. In May 2019, Davis F. Stupnick, a former corrections officer at Albion, was arrested and charged with four counts of second-degree sex abuse, two counts of third-degree criminal sex act, and official misconduct in connection with "sex [Stupnick had] with two female inmates" at Albion while operating in his former capacity as a corrections officer thereat.

   c. Most recently, in August 2020, James Castonguay, a former corrections officer at Albion, was arrested on two counts of rape in the third degree, four counts of criminal sex act in the third degree, and four counts of official misconduct and plead guilty to two counts of criminal sexual act in the third degree in connection with unlawful sexual relations that he had with two female inmates of Albion, while operating within his former capacity as a corrections officer thereat.

   d. Just months before, in February 2020, a class action was filed against Commissioner Annucci, the former superintendent of Albion correctional facility, and two individual former corrections officers at Albion. The

lawsuit, filed in the Southern District of New York, titled *Stone v. Annucci et al.* 20-cv-1326, alleges one Plaintiff, a former inmate at Albion was "manipulated into sexual activity by gifts and favors," and another "was forcibly raped and sodomized in the laundry room," and that the woman saves the officer's semen in a sock. The litigation is still ongoing.

50. The Defendants know that cases that result in criminal prosecutions or the discipline of staff do not reflect the entire universe of staff misconduct, given that the Defendants only investigate incidents of sexual misconduct, harassment, and abuse that have been reported, and Defendants know that staff sexual abuse is significantly underreported.

   a. Victims of sexual abuse, generally, are unlikely to come forward with complaints of sexual misconduct due to embarrassment and humiliation and a fear that such complaints will be greeted with skepticism or disbelief.

   b. These concerns are exacerbated in a correctional setting, where the persons to whom such complaints are to be made are colleagues of the perpetrator(s) of the abuse, putting the victim at risk of retaliation; where complains of such abuse are not maintained in a confidential fashion; and where there is a well-founded belief by women prisoners that such complaints will be greeted with skepticism and will not result in any action against the perpetrator.

   c. Women prisoners who were subjected to physical or sexual abuse prior to their incarceration, particularly those who complained to no avail, may face

additional psychological and emotional obstacles to complaining of sexual misconduct while in prison. These women are unlikely to come forward with such complaints while in prison.

51. The Defendants' failure to implement and enforce policies and practices that would actually prevent and punish all sexual abuse contributes to a lenient and permissive prison culture and increases the risk of sexual abuse of women prisoners.

   a. Some of the abuse that takes place in prisons is deemed by staff to be "consensual." In other words, the inmates are not necessarily subjected to physically forcible abuse, but rather, appear to enter into sexual contact voluntarily. However, any purportedly "consensual" sexual activity between correctional staff and the prisoners they are paid to guard and control is a fallacy, regardless of the "willingness" of the prisoner. Consent in such circumstances is non-existent under the law, as nearly every state legislature in the United States has recognized.

   b. Purportedly "consensual" sexual activity between inmates and officers does not resemble actual "consent" as it might exist outside of the prison context.

   c. Instead, the coercive nature of the relationship between officers and prisoners is well-recognized. There is a clear power differential, with officers having complete discretion over the treatment of the prisoner under his supervision, including the ability to discipline a prisoner should she disobey an order. As previously stated, the recognition of this dynamic is

reflected in the criminal laws of almost every state, criminalizing sexual acts by correctional officers with prisoners and barring the assertion of "consent" as a defense.

d.  Frequently, staff increase the level of coercion and manipulation by providing prisoners with contraband such as money, personal care items, food, or even drugs and alcohol. Staff members frequently talk with prisoners about their personal lives and then use the information about their families or about their histories with drug and alcohol abuse for further coercion.

e.  There is often evidence of physical force during the sexual acts themselves. These acts of aggression and violence intimidate the women victims and make them fearful of how the staff person may harm them should the reject any future advances or requests.

f.  And, finally, once an officer has convinced a prisoner to "go along" with sexual activity, it is increasingly difficult for the prisoner to extricate herself from the "relationship" for fear of retaliation by the officer or his colleagues.

**Defendants fail to enact supervisory policies that would prevent sexual abuse by male staff and fail to enforce existing policies**

52. Despite known risks and incidents of sexual misconduct by staff, the Defendants, through their policies and practices (or lack thereof) have recklessly disregarded these ricks and have failed to protect the women prisoners in their custody from harm.

53. The Defendants inadequately supervise correctional staff, placing women prisoners at a heightened risk of sexual abuse.

54. The Defendants have failed to enact appropriate rules and policies concerning the behavior of male staff and fail to enforce existing rules and policies governing staff behavior.

55. Despite knowledge of the risk of sexual abuse in women's prisons, the Defendants assign male corrections officer to a women's prisons.

56. Despite knowledge of the risk of sexual abuse in women's prisons, the Defendants assign male corrections officers to posts on which they have ample opportunity for unmonitored contact with women prisoners.

57. Upon information and belief, the Defendants have failed to enact adequate rules and policies to monitor and discipline staff engaged in behavior that constitutes warning signs of sexual abuse, such as spending a disproportionate amount of time talking to a particular prisoner, repeatedly requesting a particular prisoner for a particular assignment, discussing their personal life with a prisoner, or asking a prisoner personal questions. Staff are not disciplined or informally counselled when supervisors witness behavior that is indicative of warning signs of sexual abuse.

58. Upon information and belief, the Defendants have failed to enact adequate rules and policies to protect women prisoners from sexual innuendos, degrading sexual comments, and propositioning, and to enforce those rules and policies that do exist.

59. Upon information and belief, the Defendants have failed to enact appropriate rules and policies concerning the behavior of male corrections officers posted to housing units in order to protect the privacy of women prisoners and to protect them from harassment and sexual assault. The Defendants also fail to enforce those rules and policies that do exist. For example, DOCCS policy requires male corrections officers to announce their presence only the first time they enter a living area, allowing male officers to re-enter living quarters and bathroom areas unannounced, and to watch women dress and undress. **Exhibit 1, DOCCS Directive 2230, "Guidelines for Assignment of Male and Female Officers,"** (at § II.E). Male corrections officers are not disciplined or reprimanded for such conduct.

60. Upon information and belief, the Defendants fail to require and conduct reasonable searches of correctional staff upon entry to correctional facilities that could help prevent or discourage sexual abuse or ultimately assist in the investigation of allegations of staff sexual misconduct. The failure to catch correctional staff with contraband such as drugs or alcohol, or to limit entry of condoms, cell phones, notes, and other personal items allows officer the opportunity to use these items to influence, coerce, or otherwise manipulate prisoners into performing sexual acts and limits the evidence that could be used in investigations of staff sexual misconduct.

61. Staff are left alone and virtually unmonitored by supervisors for hours at a time, with staff supervision almost entirely of supervisory "rounds."

62. The Defendants fail to enact and enforce adequate rules and policies that dictate the content and substance of limited supervisory rounds.

63. The Defendants' system for the reporting, investigation, and response to complaints of sexual misconduct is grossly inadequate to prevent and remedy ongoing sexual misconduct. The current system, which relies almost completely upon women prisoners to come forward and report the misconduct, fails to utilize reasonable and available investigative tools; fails to credit allegations of sexual misconduct unless the woman has physical proof or other substantial corroboration of the misconduct; is biased; deters women prisoners from reporting sexual misconduct; and fails to take appropriate action against perpetrators if and when women do come forward. The effect of this system is to allow sexual misconduct by staff to continue virtually unabated.

**Defendants fail to take affirmative steps to investigate staff sexual misconduct, despite knowledge that sexual abuse is underreported, thus placing women prisoners at an increased risk of abuse.**

64. Defendants know that, given the reluctance of victims of staff sexual abuse to come forward, having an investigative and discipline system that relies primarily on women prisoners to volunteer complaints is insufficient to prevent and remedy this misconduct. Nonetheless, Defendants rely on such a system and fail to utilize other means to root out sexual misconduct.

65. Women prisoners, particularly those who receive favors from officers such as contraband, are unlikely to report abuse because they understand they may be

subject to punishment and are therefore chilled and deterred from reporting, thereby perpetuating staff misconduct.

   a. Women understand that they may be charged with disciplinary offenses, such as possession of contraband, being out of place, or inappropriate conduct with an officer. Women also understand that they may be charged with making false statements if DOCCS does not believe their complaints were made in good faith.

   b. Women who make such complaints are often transferred to different prisons, while the perpetrator is permitted to continue working in the same facility. These transfers may disrupt women's contact with their children and family, and participation in program and job assignments. Because disciplinary history, placement in administrative segregation, and program and job assignments are considered by the merit board and the parole board, a women who complaints about sexual misconduct also risks lengthening her incarceration.

   c. Upon information and belief, despite the low likelihood of receiving reports from women prisoners about abuse by staff, Defendants rarely employ obvious measures to reduce the risk of sexual misconduct between staff and women prisoners and to prevent misconduct from occurring, escalating, or continuing. These include measures such as heightened monitoring of situations where there have been warning signs of sexual misconduct or inappropriate relationships; searches of correctional staff; use of lie

detectors; real-time review of video camera feeds; periodic review of camera footage; use of electronic recording devices; exit interviews of prisoners upon transfer and release; random interviews of staff and prisoners; and frequent, varied, and unannounced rounds by supervisory officials.

**Defendants' system for investigating complaints of staff sexual misconduct is inadequate and places women prisoners at an increased risk of abuse.**

66. Defendants' treatment of women prisoners' complaints of sexual misconduct by staff essentially dooms those complaints to failure. An allegation of sexual misconduct based exclusively or primarily on the statement of a woman prisoner will not be substantiated, and will not result in any action being taken against the staff person, even if credible and even if supported by witnesses.

67. Defendants require an unreasonable burden of proof before substantiating an allegation of staff sexual misconduct and taking administrative or disciplinary action with respect to male staff.

   a. Investigators do not apply any consistent standard in determining whether to substantiate an allegation of staff sexual misconduct and refer it for administrative action. Typically, for an allegation of sexual misconduct or abuse to be substantiated, there must be either physical evidence or video surveillance.

   b. Defendants' investigations to determine if an allegation of staff sexual abuse should be substantiated do not give adequate, if any, weight to indicia of sexual misconduct in the absence of physical evidence. Such indicia include staff persons being seen out of place; staff persons allowing inmates

into areas where inmates are not permitted; staff persons engaging in behavior suggestive of an inappropriate relationship; and staff giving contradictory statements to investigators.

c. Upon information and belief, Defendants' investigations fail to give adequate weight to similar prior complaints of sexual misconduct against the same staff member. Such patterns may include allegations that a staff member has used the same language in propositioning more than one woman prisoner; allegations that an officer has taken more than one woman prisoner to the same location to engage in sexual abuse, or allegations that an officer has avoided having witnesses to the misconduct by engaging in the abuse during the count, when other inmates are locked into their cells and therefore unable to observe it.

d. Defendants' investigations fail to give adequate weight to the credibility of witnesses. They do not credit the statements of prisoner witnesses, while giving undue weight to statements of staff.

68. The Defendants' investigations are not thoroughly or timely conducted and often result in biased and unreliable refusals to substantiate women prisoners' complaints.

a. Upon receiving a report of sexual abuse, Defendants fail to protect women prisoners who complain of experiencing sexual misconduct by staff from retaliation or intimidation.

17

b.  During the investigation of a complaint, an alleged perpetrator of sexual misconduct can remain in the same prison and can even continue to be posted in areas where he will be in contact with or responsible for guarding the victim of the misconduct.

c.  The fear of retaliation by the officer or his colleagues can discourage women prisoners (both victims and witnesses) from cooperating with investigators when sexual abuse has been reported.

d.  Defendants do not always complete investigations into claims of sexual harassment and abuse in a prompt manner, potentially subjecting both the woman who has complained and other women prisoners to continued abuse for weeks or months until an investigation is complete, and subjecting the victim to continued uncertainty.

e.  Upon information and belief, because Defendants do not maintain camera footage for a sufficient amount of time, any delays in investigation increase the already significant possibility that potentially corroborating camera footage will no longer be available.

69. Investigations are not often conducted in a thorough, professional, and unbiased manner. Instead, investigators' methods are often hostile, use inappropriate language, reveal confidential information about prisoners and investigations to other prisoners, and ultimately result in deterring complete and truthful statements from those they interview or chilling prisoner participation completely.

a. The OSI, which investigates allegations of staff sexual abuse, is part of DOCCS. It is not an independent agency.

b. Most investigators are former corrections officers, and some are staffed to investigate the same facilities where they formerly worked as corrections officers (and, therefore, their former colleagues). Many investigators eventually return to work as corrections officers.

c. The standard of proof required to substantiate an allegation of staff sexual abuse is not consistent across cases.

d. Investigators may either fail to obtain, or unreasonably delay obtaining, physical evidence even when such evidence could be probative. For example, locations of materials potentially containing DNA that would be corroborative of the complaint have, upon information and belief, at times not been collected.

e. Information provided to OSI investigators is also not kept confidential, even when staff promise confidentiality. Prisoners interviewed as potential witnesses are frequently told the identity of the prisoner and staff person being investigated, who made the initial allegation, and what other prisoners have said to the investigator.

f. Because staff do not conduct investigations into complaints of sexual misconduct in a confidential manner, the perpetrators of misconduct or their colleagues can easily learn of the investigation and inflict harassment or retaliation upon women prisoners.

**Defendants' failure to review and assess policies and procedures places women at an increased risk of abuse.**

70. Defendants have structured their system for addressing allegations of staff sexual misconduct so that there is virtually no assessment of whether any of Defendants' policies or procedures may have allowed the misconduct to take place. For example, investigative staff do not consider it part of their function to determine whether policies or procedures have enabled the sexual misconduct to take place or have allowed it to continue—for example—failing to regulate one male staff person being alone in enclosed areas with a female prisoner, allowing staff to pick certain prisoners for programs or work crews under their supervision, or allowing staff to ignore warning signs like prolonged conversations with a prisoner or obvious misconduct on the part of other officers.

**FIRST CAUSE OF ACTION**
**A.G. v. MATTHEW GREEN; COMMISSIONER ANNUCCI; ALBION CORRECTIONAL FACILITY**
**Eighth Amendment of the U.S. Constitution**
**Cruel and Unusual Punishment *Per Se***

71. A.G. repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

72. The Eighth Amendment to the U.S. Constitution provides that "excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*," (emphasis added).

73. On October 4, 2020, between approximately 1:45 pm and 2:45 pm., A.G., a female prisoner, was intentionally and violently attacked, sexually assaulted, and battered by Green, a male correctional officer of Albion Correctional Facility.

74. Physically and psychologically, A.G. was, and continues to remain damaged.

75. At the time of sexual assault, Green was the only corrections officer in charge of patrolling and keeping order in A.G.'s all-female unit.

76. During this same time, no other corrections officers, male or female, were patrolling and/or keeping order in A.G.'s unit.

77. Upon information and belief, this is the policy, custom and practice of Albion and/or the Department of Corrections and Community Supervision.

78. Green, while acting under color of Albion and/or DOCCS custom and practice, by his actions, did place A.G. in imminent fear of immediate offensive physical contact and did assault, sexually assault, batter, and rape A.G.

79. The force used by Green against A.G. was malicious and sadistic and hurt A.G. both physically and psychologically.

80. A.G. did not solicit Green or his actions.

81. A.G. did not want Green's sexual attention.

82. Green's unprovoked actions and unwanted sexual attention offends evolving standards of decency.

83. Green's actions subjected A.G. to cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution.

84. Because A.G. was incarcerated, she lacked the ability to consent to engage in sexual relations with Green.

85. Despite her inability to consent by virtue of her incarceration, A.G. felt that she had no other choice but to engage in sexual relations with Green so as to avoid

any charges and/or repercussions and/or retaliations.  Such constitutes a *per se* violation of the Eighth Amendment.

86. Defendant Albion and Defendant Commissioner Annuci, through his power as Commissioner of DOCCS, permitted Green, a male corrections officer, to supervise female prisoners by himself and without any supervision.

87. This constitutes an adoption of a policy, custom, and practice of indifference to A.G.'s constitutional rights, resulting in her rape.

88. Albion knew or should have known of the risk and ignored it.

89. The prevalence and frequency of rape in prisons promulgated the Prison Rape Elimination Act of 2003 (PREA).

90. Defendants Albion and Comissioner Annuci acted with deliberate indifference toward the sexual assault.

91. Defendants Albion and Comissioner Annuci acted with deliberate indifference to the risk of A.G.'s safety in violation of the Eighth Amendment.

92. Green has a sufficiently culpable state of mind.

93. Green's sexual assault of A.G. is deeply offensive to A.G.'s human dignity.

94. A.G. suffered and continued to suffer severe physical and psychological injuries.

95. Green, while acting under color of Albion and/or Comissioner Annuci's policy, custom and practice, committed the sexual assault against A.G..

96. The Defendants subjected the A.G. to cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution.

97. Due to the Defendants' violations of the Eighth Amendment of the U.S. Constitution, A.G. is entitled to recover damages and the Defendants are thus liable for damages in an amount to exceed jurisdictional limits of all lower courts which may have jurisdiction over this matter.

## SECOND CAUSE OF ACTION
### A.G. v. MATTHEW GREEN; COMMISSIONER ANNUCCI; and ALBION CORRECTIONAL FACILITY
### Fourteenth Amendment of the U.S. Constitution
### Deprivation of Liberty and Right to be Secure

98. A.G. repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

99. Green's actions deprived A.G. of her liberty and right to be secure as guaranteed under the Fourteenth Amendment of the U.S. Constitution. Because A.G. was incarcerated, she lacked the ability to consent to engage in sexual relations with Green.

100.   A.G. felt that she had no other choice but to heed to Green's demands and perform sexual acts against her will on Green so as to avoid repercussions. A.G. was unlawfully detained and confined against her will.

101.   Defendant Albion Correctional Facility and Commissioner Annuci, through his power as Commissioner of DOCCS, permitted Green, a male corrections officer, to supervise female prisoners by himself and without any supervision.

102.   This constitutes an adoption of a policy, custom, and practice of indifference to A.G.'s constitutional rights, resulting in her rape.

103.   Defendants acted with deliberate indifference toward the violent sexual assault in violation of A.G.'s Fourteenth Amendment rights.

104.   Defendants Albion and Commissioner Annuci acted with deliberate indifference toward the sexual assault.

105.   Defendants Albion and Comissioner Annuci acted with deliberate indifference to the risk of A.G.'s safety in violation of the Fourteenth Amendment.

106.   Due to the Defendants' violations of the Fourteenth Amendment of the U.S. Constitution, A.G. is entitled to recover damages and the Defendants are thus liable for damages in an amount to exceed jurisdictional limits of all lower courts which may have jurisdiction over this matter.

## FOURTH CAUSE OF ACTION
### A.G. v. COMMISSIONER ANNUCCI
### New York State Corrections Law § 500-b

107.   A.G. repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

108.   Albion severely compromised the A.G.'s personal safety and welfare while she was a prisoner of Albion. Albion permitted Green (a lone, male, unsupervised correctional officer) to supervise A.G. (a female prisoner), thereby adopting a policy, custom and practice of indifference to A.G.'s constitutional rights.

109.   As a result of Albion's deliberate indifference, A.G. was sexually assaulted by Green and sustained severe physical and psychological injuries. Said assault was easily foreseeable.

110.    Albion's failure to exercise appropriate and adequate precautions severely compromised A.G.'s personal safety and welfare resulting in A.G.'s physical and psychological injuries.    Albion, therefore, acted with deliberate indifference toward the Plaintiff's personal safety and welfare in violation of New York State Corrections Law § 500-b.

111.    Commissioner Annuci, acting on behalf of the New York State Department of Corrections and Community Supervision was responsible for implementing and carrying out the goal of preventing sexual abuse and/or sexual harassment in New York State's facilities. Commissioner Annuci failed to do so.

112.    A.G.'s injuries were easily foreseeable.

113.    The actions of the Defendants resulted in A.G.'s personal safety and welfare being severely compromised and her physical and psychological injuries in violation of New York State Corrections Law § 500-b.

114.    Due to the Defendants' violations of New York State Corrections Law § 500-b., A.G. is entitled to recover damages and Defendants are thus liable for damages in an amount to exceed jurisdictional limits of all lower courts which may have jurisdiction over this matter.

## SIXTH CAUSE OF ACTION
### A.G. v. MATTHEW GREEN
### New York Common Law Assault

115.    A.G. repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

116.   Without A.G.'s consent, Green sexually assaulted A.G.. Green forcibly grabbed A.G. by her shoulders an held her down against her will, thus instilling in A.G. apprehension of injury and crippling fear.

117.   As a direct and proximate cause of the aforementioned rape and assault, A.G. suffered, and continues to suffer physical injuries to her neck, severe emotional distress, conscious pain and suffering, mental distress, fright, and humiliation.

118.   A.G. is, therefore, entitled to recover damages and Green is liable for damages in an amount to exceed jurisdictional limits of all lower courts which may have jurisdiction over this matter.

<u>**SEVENTH CAUSE OF ACTION**</u>
**A.G. v. MATTHEW GREEN**
**New York Common Law Battery**

119.   A.G. repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

120.   Without A.G.'s consent, Green sexually assaulted A.G.. Green forcibly grabbed A.G. by her shoulders an held her down against her will.

121.   As a direct and proximate cause of the aforementioned rape and battery, A.G. suffered, and continues to suffer physical injuries to her neck, severe emotional distress, conscious pain and suffering, mental distress, fright, and humiliation.

122.   A.G. is, therefore, entitled to recover damages and Green is liable for damages in an amount to exceed jurisdictional limits of all lower courts which may have jurisdiction over this matter.

## EIGHTH CAUSE OF ACTION
### A.G. v. MATTHEW GREEN
### New York Common Law False Imprisonment

123.   A.G. repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

124.   Green unlawfully and intentionally confined A.G. in the Albion's linen closet, without her consent, in order to commit the sexual assault against A.G..

125.   The small linen closet, with only one source of ingress or egress served as Green's confining boundaries.

126.   Green's intention was to confine A.G. to the linen closet.

127.   Green intentionally followed A.G. into the linen closet without her knowledge.

128.   The small linen closet served as the ideal place for confinement for Green to commit the sexual assault.

129.   A.G. had nowhere to escape.

130.   Green blocked the only source of ingress or egress.

131.   A.G. was prohibited from leaving the closet.

132.   Within the confining boundaries of the linen closet, A.G. was then forced, against her will, to perform sexual acts on Green.

133.   A.G. had no other choice but to submit to Green's demands.

134.   Green falsely imprisoned A.G. thereby depriving her of her liberty.

135.   A.G. was unlawfully and intentionally confined against her will and raped.

136.   As a result, A.G. suffered and continues to suffer severe physical and psychological injuries.

137.    A.G. is, therefore, entitled to recover damages and Green is liable for damages in an amount to exceed jurisdictional limits of all lower courts which may have jurisdiction over this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff A.G. prays for relief and demands judgment in her favor on each of her claims against the Defendants as follows:

a.    That a jury find and the Court adjudge and decree that A.G. shall recover compensatory damages, plus punitive damages, jointly and severally, together with interest.

b.    That A.G. recover the costs of the suit herein, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

c.    That A.G. be awarded such other and further relief as this Court deems just and proper.

## PLAINTIFF DEMANDS A JURY TRIAL

Pursuant to FRCP 38, A.G. hereby demands a trial by jury in this action on all claims and issues triable before a jury.

**Edward E. Kopko, Esq.**
Edward E. Kopko, Lawyer, P.C.,
*Attorney for Plaintiff, A.G.*
308 N. Tioga Street, Second Floor
Ithaca, New York 14850
607.269.1300; Fax 607.269.1301
ekopko@kopko.law
Monday, March 28, 2022

EXHIBIT ONE

| NEW YORK STATE **Corrections and Community Supervision** **DIRECTIVE** | TITLE **Guidelines for Assignment of Male and Female Correction Officers** | NO. 2230 |
|---|---|---|
| | | DATE 02/21/2019 |

| SUPERSEDES DIR# 2230 Dtd. 09/14/17 | DISTRIBUTION A | PAGES PAGE 1 OF 3 | DATE LAST REVISED |
|---|---|---|---|

| REFERENCES (Include but are not limited to) Directive #4910, *Forts v. Ward*, 621 F.2d 1210 (2d Cir. 1980) | APPROVING AUTHORITY *James A. O'Gorman* |
|---|---|

I. **INTRODUCTION**: The purpose of this directive is to ensure that the Department's policies regarding the employment of Correction Officers are in full compliance with the Constitution and Statutes of the United States and the State of New York. *

In complying with the law, the Department is mindful of its duty to balance its various obligations under the law including:

A. The Department's obligation to maintain the security and safety of its facilities and to provide a safe and secure place for its employees, incarcerated individuals, and visitors to the Department's facilities.

B. The Department's obligation to ensure to its employees equal rights to employment in any position in its facilities, regardless of gender, consistent with the provisions of this directive.

C. The Department's obligation to its incarcerated individuals consistent with the provisions of this directive. The incarcerated individuals' privacy will be protected to the extent the Department is able to do so. For instance, if the incarcerated individual wishes to take a shower in the yard, he or she must be prepared to be viewed by any employee who may be in or near the yard.

*NOTE: The decision of the United States Court of Appeals for the Second Circuit in *Forts v. Ward*, 621 F.2d 1210 (2d Cir. 1980) covers Bedford Hills Correctional Facility. Accordingly, this Directive applies to Bedford Hills Correctional Facility only to the extent that the Directive provides privacy accommodations for incarcerated persons that exceed those required under the decisions in *Forts v. Ward*.

II. **POLICY**

A. All Correction Officers will perform the duties that are assigned to them, regardless of gender, provided however that the following assignments will not be made to Correction Officers who are not of the same gender as the incarcerated individuals:

1. Strip frisks or strip searches;

2. Obtaining a urine specimen;

3. Congregate shower facilities;

4. Videotaping of strip frisks or strip searches using handheld video cameras or body worn cameras;

5. Special Watch (e.g., drug watch);

6. Suicide Watch; or

7.  Security monitoring of visiting room incarcerated individual bathrooms via CCTV or vision panels.

NOTE: Cross-gender coverage of an incarcerated individual on a Suicide Watch is permissible if exigent circumstances exist. Exigent circumstances must be logged.

B.  Where incarcerated individuals are transported outside of the facility, at least one transporting Correction Officer shall be of the same gender as the incarcerated individual(s) being transported.

C.  Whenever two or more Correction Officers are assigned to an outside security detail, at least one must be of the same gender as the incarcerated individual. If only one Correction Officer is assigned to an outside security detail, that Correction Officer shall be of the same gender as the incarcerated individual. If, however, a "roving Correction Officer" is assigned to the hospital and is the same gender as the incarcerated individual, the gender of the Correction Officer assigned individual coverage is immaterial. The gender concern for staff does not apply for outside crew assignments (i.e., community crews).

D.  Cross-gender pat frisks will only be performed in accordance with the procedures set forth in Directive #4910, "Control of & Search for Contraband."

E.  Staff of the opposite gender shall verbally announce their arrival on a housing unit at a minimum upon each change of shift and when the gender-supervision on a housing unit changes from exclusively same gender, to mixed or cross gender-supervision to avoid unnecessarily invading the privacy of incarcerated individuals of the opposite gender, unless emergency conditions dictate otherwise. The announcement(s) by staff must be accomplished in a manner that is easily heard and/or understood by all incarcerated individuals on the unit. This announcement will be recording in the unit logbook.

F.  Except for in-cell shower stalls at "S" blocks, and at Upstate and Five Points Correctional Facilities, individual shower stalls will utilize the Corcraft manufactured poly vinyl shower curtain that is designed as breakaway with Velcro straps for attaching. The top and bottom panels of the shower curtains are constructed of poly clear vinyl for viewing the head, lower legs, and feet of the incarcerated individual occupying the shower. The center panel is constructed of poly green vinyl providing privacy to the incarcerated individual utilizing the shower. The Corcraft PREA Shower Curtain is available in three configurations to accommodate individual shower stalls: shower curtains in 30" wide x 80" high and 36" wide x 80" high have 18" top and 22" bottom clear vinyl panels with a 40" poly green vinyl center section. As an alternative for female housing areas where deemed appropriate, Corcraft produces a 38" wide x 80" high version with 10" top and 22" bottom clear vinyl panels with a 48" poly green vinyl center section. The shower curtain must be of sufficient length to cover the bodies of incarcerated individuals and extend to the floor.

G.  In-cell shower stalls at "S" blocks and at Upstate and Five Points Correctional Facilities will utilize the Corcraft manufactured poly cotton blend fabric shower curtain. This 48" long fabric shower curtain is available in both 26" and 43" widths to accommodate individual shower stalls. This shower curtain is to be installed with the top of the curtain at 60" from the shower floor.

**III.    EMERGENCIES**:  During emergencies, Correction Officers, regardless of gender, may perform any necessary duties including those otherwise prohibited by reason of gender.